## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Alson Alston,

Plaintiff,

– against –

The Pennsylvania State University,
The Trustees of The Pennsylvania State
University,
Eric J. Barron, as President of The Pennsylvania
State University,
The Dickinson School of Law of The
Pennsylvania State University,
Gary S. Gildin, as Dean of Dickinson School of
Law of The Pennsylvania State University,
Office of Student Aid of the Pennsylvania State
University,
Anna M. Griswold, as Executive Director of
Student Aid at The Pennsylvania State University,
and
Susan A. Bogart, as Director of Financial Aid at
the Dickinson School of Law of The Pennsylvania
State University,

Defendants.

Civil Action No.: 14-CV-2480



FILED

DEC 3 0 2014

PER _____
HARRISBURG, PA   DEPUTY CLERK

### VERIFIED COMPLAINT

Plaintiff Alson Alston, acting pro se, hereby complains of The Pennsylvania State University ("PSU"), The Trustees of PSU, Eric J. Barron, as President of PSU, the Dickinson School of Law of the Pennsylvania State University ("Dickinson"), Gary S. Gildin, as Dean of Dickinson, the Office of Financial Aid at PSU ("Financial Aid Office" or "Financial Aid"), Anna M. Griswold, as Executive Director of Student Aid at PSU, and Susan A. Bogart, as Director of Financial Aid at Dickinson (collectively, "Defendants") as follows:

1. Alston is a 50-year old third year law school student at Dickinson who is primary financial and home-healthcare support for his mother ("Mrs. Morris"), an 84-year-old widow of police officer and Navy veteran J. Morris, who suffers from diabetes, hypertension, crippling osteoarthritis, Graves

disease, kidney cancer, severe memory and motor control loss resulting from a recent stroke, and other maladies that keep her homebound and largely confined to a wheelchair. She requires 24-hour, in-home care which Alston and his sister provide directly and through home health aides ("HHAs").

2.   Alston's eldercare expenses for his mother easily qualify as educational expenses, pursuant to the Higher Education Act ("HEA"). (See Count I, below.)

3.   The Financial Aid Office, specifically Bogart, has refused to process and approve Alston's eldercare expenses as educational expenses since he inquired on July 16, 2014, applied on Sept. 8, 2014, supplied documentary evidence on Sept. 26, 2014 and additional evidence on Nov. 10, 2014. Alston and his family have suffered tremendously through diminished care for his mother, based on limited family funds; the 80+ hours he must devote to her care each week, instead of preparation for coursework, papers and exams; uncertainty and shortages regarding food, utilities, housing, travel and his ability to pay for his education.

4.   The Financial Aid Office placed an indefinite hold on Alston's financial aid on Oct. 27, 2014 through an unwarranted "verification process" and, though its work was completed on Nov. 13, 2014, it has never informed Alston of the results, never released its hold, never permitted funding for the Spring semester, and never approved Alston's eldercare expenses as educational expenses.

5.   The actions of the Financial Aid Office are intentional, arbitrary choices, inconsistent with its own and Department Education ("Dept. of Ed.") regulations, in part, and reflecting unaccountable internal practices, in part.

6.   The unconscionable delays and denials of the financial aid described herein, to which Alston is fully and demonstrably entitled, violates Alston's procedural due process, substantive due process, and equal protection rights under the Fourteenth Amendment. This deprivation of Alston's constitutional rights permits Alston to bring a claim under Section 1983 of the Civil Rights Act of 1871, as amended, now codified as 42 U.S.C. § 1983 ("Section 1983"); is a breach of the Defendants' fiduciary duty and duty of care stemming from their roles as public education administrators; violates

the Americans with Disabilities Act ("ADAAA") and Rehabilitation Act; and violates tort claims of defamation, negligence, and breach of contract.

7.   Alston brings this action against PSU, a Pennsylvania non-profit corporation, of which Dickinson is a constituent academic unit; Dickinson; Barron, whose office received Alston's complaints against Bogart and the Financial Aid Office, but refused to act to force the Financial Aid Office to act accountably and predictably, and who negligently administers PSU; Bogart, whose negligence, incompetence, malice, and retaliatory actions in the Financial Aid Office have denied Alston necessary information to secure funding for his law school education, unreasonably delayed processing of Alston's financial aid requests for more than a year in one case and more than a semester in another, denied Alston approval for loans to cover necessary educational expenses for more than a year in one case and more than a semester in another – leading to significant financial distress for Alston and his family, defamed Alston with reckless, false allegations that Alston completed financial forms in a misleading and deceptive manner, threatened the mental and physical health of him, his mother and his family, and both threatened and continues to threaten to force him to leave school after borrowing more than $150,000 in educational loans; Griswold, who received Alston's complaints against Bogart but only selectively and ineffectively acted, and who negligently and incompetently administers the Financial Aid Office; and Gildin, who received Alston's complaints against Bogart and the Financial Aid Office, but refused to intervene to ensure that the Financial Aid Office acted constitutionally, and who negligently administers Dickinson.

8.   The purpose of this action is to put a judicial halt to Defendants' illegal, improper, unethical and unconscionable delays in informing him of his financial aid rights, delays in approving his financial aid, cancellation of his aid for the Spring 2015 semester, defamation, threats to his health and well-being, retaliation for his escalation to PSU/Dickinson authorities, and attempts to destroy his academic career for the arbitrary, capricious, petty, employment-preserving, and mean-spirited ends of the Financial Aid Office and its employees.  These activities by the Defendants directly contravene the

fiduciary duty required of all financial aid officers and the duty of care implicit in the administration of educational institutions.  These activities were taken with the full awareness of the devastating impact they would have Alston and his family.

## THE PARTIES

9.  The Pennsylvania State University is a non-profit state-related Pennsylvania corporation,[1] with the address of 201 Old Main, University Park, Pennsylvania 16802 and a phone number of 814-865-4700.

10. The Trustees of The Pennsylvania State University is the governing body of PSU, with the address of 201 Old Main, University Park, Pennsylvania 16802 and a phone number of 814-865-4700.

11. Eric J. Barron is President of The Pennsylvania State University.  His address is 201 Old Main University Park, PA 16802 and his phone number is 814-865-7611.

12. The Dickinson School of Law of The Pennsylvania State University is a constituent academic unit of PSU, whose existence as a separate legal entity ended on July 1, 2001 through a court-approved merger.  Miller v. The Pennsylvania State University, 2005 WL 5276345 (Pa.Com.Pl.). Dickinson's address is 150 S. College Street, Carlisle, PA 17013 and its phone number is 717-240-5000.

13. Gary S. Gildin is Interim Dean of Dickinson School of Law of The Pennsylvania State University, Carlisle Campus.  His address is 150 S. College Street, Dean's Office, Carlisle, PA 17013 and his phone number is 717-240-5238.

14. The Office of Student Aid for the Pennsylvania State University is a constituent unit of the Pennsylvania State University and is operated by Griswold.  Financial Aid's address is 314 Shields Building, University Park, PA 16802 and its phone number is 814-865-6301.

15. Anna M. Griswold is the Executive Director for Student Aid at The Pennsylvania State

---

[1] *State-Related Universities*, PENNSYLVANIA DEPARTMENT OF EDUCATION, http://www.portal.state.pa.us/portal/server.pt/ community/institution_types/8713/state-related_universities/522465 (last visited Dec. 21, 2014).

University.  She is the direct supervisor of Bogart.  Her address is 311 Shields Building, University Park, PA 16802 and her phone number is 814-865-1179.

16. Susan A. Bogart is Director of Financial Aid at the Dickinson School of Law of The Pennsylvania State University.  She has served as Alston's primary Financial Aid contact and decision-maker.  Her address is Lewis Katz Building, University Park, PA 16802 and her phone number is 814-863-0469.

## FACTS

17. July 2013 – Alston enrolled in Dickinson as a second-year transfer student.

18. Oct. 4, 2013 – Alston makes first request of Financial Aid for increased borrowing authority to cover additional educational costs (transportation and eldercare expenses), pursuant to the HEA.

19. Nov. 10, 2013 – Alston was in Philadelphia caring for his mother when he had to rush her to the hospital.  He was told that she had:

> indications of kidney cancer, lung cancer, pulmonary high blood pressure (which I had never heard of). In the last two weeks, she has had continual chest pains, swollen ankles, difficulty breathing -- on top of crippling arthritis that confines her to her home and two other debilitating diseases.

20. Nov. 11, 2013 – Alston requests additional information on how he can qualify his eldercare expenses (for medical services and trips between Carlisle and Philadelphia to care for his mother) as educational expenses.

21. Nov. 19, 2013 -- Bogart provides instructions for qualifying Alston's personal transportation and personal health needs as educational expenses, but provides no information on qualifying eldercare expenses.  She requests receipts as evidence of medical expenses for Alston's diabetic diet.

22. Nov. 22, 2013 – Alston supplies all required final documentation for transportation and health-related expenses and asks for peer review of his thus far unsuccessful cost of attendance increase requests.

23. Feb. 14, 2014 – **Three months** after requesting a review of his transportation and medical expenses for educational budget increases and after escalating the failure of Financial Aid to supply an answer, Griswold finally conducts her own peer review and answers the wrong question.  She contradicts Bogart, indicating that receipts are unacceptable evidence of medical need.  She offers Alston an additional $200 in borrowing authority.  She indicates that she wants to see more letters from medical professionals.

24. Feb. 19-24, 2014 – Alston provides four additional letters from medical professionals verifying his own personal medical needs and that his mother is required to have his assistance indefinitely.  He stresses his desperate need for funds.

25. February 25, 2014 – Alston informs his professors that he must leave school because he does not have sufficient funds, due to the delays and circular journeys of Financial Aid.

26. Feb. 27, 2014 – Alston receives notification that emergency loan proceeds will be deposited soon.  He receives the funds on or about Mar. 3, 2014.

27. Mar. 4, 2014 – After missing a week of classes, Alston informs his professors that he will be returning to class because Financial Aid appears to have relented, particularly on the elder care matter, since they approved a significant portion of his requested increase.  (Alston would learn that he was wrong about what Financial Aid learned or knew about eldercare expenses.)

28. May 20, 2014 – Bogart informs Alston that he will receive a summer semester living expense budget of $8,988.  Alston planned accordingly.

29. June 10, 2014 – After numerous unsuccessful inquiries by Alston, Bogart finally acknowledges that she miscalculated and that Alston would only receive $6,120 in summer semester living expenses (all loans), a difference of $2,868.

30. July 16, 2014 – Alston informs Bogart that his mother suffered a stroke, provides documentary evidence that he must provide 24-hour in-home care for her.  He inquires as to how his educational budget could change to reflect his new responsibilities so that he can stay in school.

6

31. Aug. 2-4, 2014 – Alston supplies Griswold with all required documentation, based on previous year's instructions from her, to prove all anticipated cost of attendance adjustments, including transportation, medical and diabetic dietary cost increases.  He requests that Griswold process his forms due to the months of delays in her organization the previous year.

32. Aug. 6, 2014 – Griswold refers Alston to Bogart for all financial aid processing, indicating that Griswold will not assist.

33. Sept. 8, 2014 – Alston makes a formal request, using PSU forms, to cover home health aides (HHA) as an eldercare expense, after his mother's insurance company cancels that benefit.

34.  Sept. 13, 2014 – Not seeing any progress in any of his requested cost of attendance increases, Alston writes to the President of the PSU to request intervention so that he can stay in school and assist his mother.

35. Sept. 15, 2014 – After a year of requesting criteria and instructions for evaluating eldercare as an educational expense, Bogart finally provides the detailed four-part certifying test, based on IRS rules.

36. Sept. 17, 2014 – Thomas G. Poole, Secretary of the Board of Trustees, answers for the Office of the President, indicating that Bogart had already completed their review of Alston's requests and that Alston's aid had already been increased.  He made no specific mention of the eldercare expenses.

37. Sept. 18, 2014 – Alston responds to Poole, indicating that the matters are not resolved and that his office should continue to monitor the situation.

38. Sept. 18, 2014 – Poole pointedly discontinues the dialog with Alston, directing all future communications to Bogart, the very person Alston demonstrated had failed to perform her duties in a timely and competent fashion.

39. Sept. 19, 2014 – Alston informs Bogart that he has fully investigated the IRS requirements she provided on Sept. 15th and that he believes he is entitled to declare his mother a dependent on his

tax return for 2014. He asks what documentation is required to get the cost of attendance adjustment for her eldercare expenses.

40. Sept. 19, 2014 – Bogart indicates that she must learn what documentation is required for eldercare expenses to be included as educational expenses and will get back to him at some unstated point in the future.

41. Sept. 24, 2014 – Bogart asks Alston several questions in an alleged attempt to clarify his living expenses.

42. Sept. 26, 2014 – Alston supplies an executed affidavit with supporting documentation that covers the four-part test for declaring his mother a dependent and qualifying her eldercare expenses as educational expenses. Alston also responds to Bogart's Sept. 24th questions and indicates that his family is suffering tremendously while attempting to cover the HHA expenses and transportation costs for his mother's medical needs. He states that his ability to prepare for and attend class is in peril.

43. Sept. 30, 2014 – Bogart decides that they can increase Alston's transportation budget but cannot qualify his eldercare expenses as educational expenses because: (a) his 2014-15 FAFSA did not include his mother in his household size and (b) his mother's residence is not the same as Alston's permanent address. She informs him that this is "contradictory" information and that he must "clarify" it "to pursue a claim of your mother as dependent."

44. Oct. 10, 2014 – Based on Bogart's Sept. 30, 2014 instructions to "clarify" his household size to include his mother and to have his "permanent address" be the same as his mother's residence, Alston changed his FAFSA, accordingly, on lines 4-7 (permanent **mailing** address changed to mother's address), line 52 (dependents changed to YES), and line 95 (number of family members changed from 1 to 2). These changes were truthful, based on Alston's Sept. 26, 2014 affidavit, supporting documents, and his tax planning. Alston owns the original permanent address (which is his office) and his mother's residence.

45. Oct. 10, 2014 – Alston informs Bogart that he has updated his FAFSA as she instructed in

her Sept. 30, 2014 email.  He also stresses the urgency of his need for eldercare expenses to be covered.

46. Oct. 13, 2014 – Bogart indicates that the Financial Aid Office is still attempting to define the documentation that Alston needs to supply.  She acknowledges that Alston changed his FAFSA, but that additional documentation is required.  She does not reference his September 26th documentation.

47. Oct. 21, 2014 – Alston writes to Dean Gildin requesting urgent intervention to hold the Financial Aid Office accountable for unconscionable delays in processing his eldercare expenses.  He informs Gildin of Alston's inability to keep up with his classes and the dire economic and medical consequences for his family caused by the delays.

48. Oct. 21, 2014 – Dean Gildin responds to Alston indicating that he will do nothing, that he has full confidence in Bogart, and that Alston must communicate only with Bogart for resolution of his financial aid matters.  Inexplicably, he CC's Bogart on this response, even though she was the subject of Alston's complaint.

49. Oct. 24, 2014 – Bogart informs Alston that his increased cost of attendance, due to personal transportation costs only, will fully disburse shortly.

50. Oct. 24, 2014 – Bogart informs Alston that he will be subjected to a formal "verification" process because: (a) Alston had changed the household size on his FAFSA; (b) that this was "conflicting information;" (c) that such "conflicting information" must be resolved with verification documentation; and (d) that Alston must prove he is providing more than 50% of his mother's financial support.  She indicates that she must continue to investigate what documentation Alston needs to provide and will tell Alston of that documentation as soon as she has it.

51. Oct. 28, 2014 – Bogart informs Alston that there is additional processing of his transportation expense disbursement ongoing.

52. Oct. 28, 2014 – Bogart informs Alston that she will shortly mail him a verification documentation request for his mother's dependency status.

53. On or about Nov. 1, 2014 – Alston receives a nine-page "Verification Letter" from Financial

Aid, dated Oct. 27, 2014.  Alston could not see how he could, as the semester winds down, properly

complete the various sections and respond to the obvious suggestions that he had falsified his FAFSA

and requests for eldercare expenses to be considered educational expenses.

54. Nov. 8, 2014 – As part of the verification process, Alston completes his 2013 tax return, so,

as required by the Dept. of Ed., he alters his FAFSA accordingly: lines 32-39 (tax return information).

55. Nov. 10, 2014 – Alston informs Bogart that he has forward his 111-page response to the

verification documentation referenced in her Oct. 28, 2014 email.  He points out that the verification

document, dated Oct. 27, 2014, also informed him that they had placed a hold on his financial aid, that

his aid for the Spring semester might be suspended and that the reason for the verification was different

than Bogart stated in her Oct. 24, 2014 email.  The reason in the Oct. 27, 2014 verification document

for requiring the extreme action of the formal verification process was that:

> Although you may be providing support for the person(s)/child(ren) listed above, your reported income of $200 in 2013 does not appear to be sufficient to provide MORE than 50 percent of their support.  Therefore, we must verify how you are able to provide more than 50 percent support for someone other than yourself.

Alston stated that this reason was pretextual because Financial Aid improperly termed his $200 entries

on lines 36 and 39 of his FAFSA as the full extent of funds available to support his family.  In fact, any

financial aid office would know that such an:

> interpretation is incorrect because those numbers don't include financial aid – which is defined to incorporate living expenses. Neither do those entries show investment income, rents, etc., when such items are losses.  Lines 36 and 39 merely show that I need financial aid, pursuant to Congressional formulas and national public policy, not how or whether I care for myself or family.

He further pointed out that his Sept. 26th affidavit clearly indicated fair rental housing expenses of

$1,400/mo for his mother, which could credibly account for 50% of a typical senior's living expenses:

> and I would not have had to spend one dime, specifically, on her.  The $200 entry, again, should properly have been seen as irrelevant, not a reason to sanction me.

Finally, he stated that the intensive "verification process" instituted by Financial Aid conflicted with the

end of the semester and took a full week from his course preparation, placing his ability to survive the

semester in jeopardy.  He stated that the real purpose of the "verification process" was to retaliate against Alston for escalating the issues with the Financial Aid Office.

56. Nov. 10, 2014 – Bogart responds that the "verification process" is not punitive, that a change in household was "conflicting information" and that "the conflict must be resolved through verification" pursuant to "federal student aid regulation."  She stated that Alston was treated as any student was.  She did not cite the regulations she allegedly followed, nor why she viewed a changed FAFSA, with changes made pursuant to her own instructions to Alston, as conflicting information.

57. Nov. 14, 2014 – Alston sends to PSU's attorneys the details of his history with Financial Aid, how their delays have harmed him and his family, and how he needs the matters resolved quickly. He informs them that he will be forced to file a lawsuit to save his family and his education.

58. Alston has never received any results from the "verification process."  He never received notification that the hold on his aid would be lifted, that he would be granted aid in the Spring Semester.

59. Alston is and has always been a student in good standing at Dickinson.  He has taken out more than $150,000 in loans to pay for his tuition and other expenses for law school.  If he does not receive reimbursement for Fall HHA expenses during 2014, he will be unable to make payments required by his tax planning strategy adopted on or about Sept. 26th, causing disastrous consequences.

## JURISDICTION AND VENUE

60. Jurisdiction is proper, pursuant to 28 U.S.C. section 1331 (federal question jurisdiction), 28 U.S.C. § 1361 (mandamus jurisdiction),  28 U.S.C. § 1343(a)(3) (Section 1983 jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction).

61. PSU, including its constituent units (Financial Aid Office and Dickinson), is a state-related institution that is subject to federal jurisdiction on Fourteenth Amendment and Section 1983 claims, as are the individual defendants acting in their official capacities.  Samuel v. Univ. of Pittsburgh, 375 F. Supp. 1119, 1127-28 (W.D. Pa. 1974) rev'd in part, 538 F.2d 991 (3d Cir. 1976) ("Penn State is best

described as a semi-autonomous state institution. . . . the Commonwealth does not exercise such actual or potential control over the operations of Penn State as to render that institution a state instrumentality as that term is meant in a Section 1983 context. . . . jurisdiction exists over the individual and corporate university defendants under both Section 1983 and the Fourteenth Amendment"). Neither is PSU immune pursuant to the Eleventh Amendment. Id. at 1128 ("Since the three universities function autonomously from the state and have been found to be persons under Section 1983, the defense of sovereign immunity is unavailable to them."). The individual defendants are not immune, for the purposes of injunctive and declaratory relief only, due to the legal fiction that their enforcement of unconstitutional actions are enforcement measures by the state. Id. at 1129 ("Declaratory and injunctive relief against the enforcement, by state officials, of an allegedly unconstitutional statute is precisely what is sought in this case. The mandate of Ex Parte Young requires this Court to accept federal jurisdiction over the defendant state officials.").

62. The actions alleged here are not proscribed by any federal law intended to be the exclusive remedy, so Section 1983 is not preempted. Molinelli-Freytes v. Univ. of Puerto Rico, 727 F. Supp. 2d 60, 64 (D.P.R. 2010) ("Where Congress truly intended a statute's remedial scheme to be the exclusive avenue through which a plaintiff may assert his claim, then the Court should find that the statute preempts claims under 42 U.S.C. § 1983.") (internal quotation marks omitted).

63. Venue is proper, pursuant to 28 U.S.C. § 1391(a)(2), because the events giving rise to the claims herein occurred in this judicial district.

COUNT 1
**VIOLATION OF ALSTON'S DUE PROCESS RIGHTS
UNDER THE FOURTEENTH AMENDMENT**

64. The Defendants violated numerous of Alston's constitutional rights, inflicting significant medical, academic, financial, and emotional injury upon him, his 84-year-old ailing mother and the rest of his family.  Alston's financial aid has been unconstitutionally suspended; he does not have the funds to attend school in the Spring 2015 or sufficient funds (loans) to cover eldercare expenses incurred in the Fall 2014 semester or that will be incurred in the Spring.  Below, we describe the requests Alston made of Financial Aid, the documentation he supplied to them, and the actions taken by the Defendants in violation of Alston's constitutional rights.  We describe the nature of the infringements of Alston's constitutional rights and how the infringements amounted to substantive and procedural due process violations justifying recovery.

**a. The most relevant facts and their implications.**

65. On Oct. 4, 2013, Nov. 11, 2013, July 16, 2014, August 2-4, 2014, and Sept. 8, 2014, Alston made requests of the Financial Aid Office for full disclosure of the standards for certifying his eldercare expenses as educational expenses (so that he could pay required medical costs for his mother in Philadelphia and his travel expenses, while he attends class in Carlisle).

66. Alston did not receive such instructions until Sept. 15, 2014.

67. Though Alston supplied all required information on Sept. 26, 2014, pursuant to Bogart's Sept. 15, 2014 emailed instructions, Financial Aid maintained that they needed additional but **unspecified** documentation on Sept. 30, 2014, Oct. 13, 2014, Oct. 24, 2014, and Oct. 28, 2014.  Only on or about Nov. 1, 2014 did Alston receive a request from Financial Aid for **specific** documentation (the Oct. 27th letter).

68. Also on Sept. 30, 2014, Financial Aid accused Alston of providing contradictory information when he altered his Free Application for Federal Student Aid ("FAFSA") to comply with their Sept. 15, 2014 email because: (a) his 2014-15 FAFSA did not include his mother in his household

13

size and (b) his mother's residence is not the same as Alston's permanent address. In fact, the information was accurate, factual and reflected future tax planning pursuant to PSU's standards for qualifying eldercare expenses **that Bogart only released to him ten days earlier**. It must also be noted that Alston's answers cannot credibly be considered contradictory to his certification that his mother could be listed as his dependent because his statements are completely consistent with the Dept. of Ed.'s FAFSA rules for the household size of independent students (Question #95)[2] and those rules were not relevant to any determination regarding the dependency status of his mother (which are determined by IRS rules, per Bogart's Sept. 15, 2014 statement). Alston's Sept. 26th affidavit and supporting documents clearly showed that, pursuant to Bogart's IRS rules, his mother would be deemed a dependent. (See next section for excerpts.)

69. As well, Alston's original "permanent address" information is listed on the FAFSAs as "permanent **mailing** address," so he had provided his office address in Philadelphia (owned by him for approximately 13 years), not his mother's address – a building he has owned for 16 years.

70. Bogart cited reasons on Sept. 30, 2014 for commencing a lengthy and formal verification process that were unrelated to policy or procedure, hence were arbitrary.[3]

71. Financial Aid accused Alston of alleging that he supported his mother and himself on $200/yr income, when the FAFSA lines they quoted do not and could not indicate that the W-2 income reported there, as a student, was the full extent of his income. They were fully aware, for instance, that he received financial aid.

72. Financial Aid used the pretexts of him providing false and misleading information to strip him of his financial aid and subject him to a lengthy "verification process" near the end of the Fall

---

[2] The FAFSA rules are taken from *FAFSA Application and Verification Guide*, Dept. of Ed., 32-33, http://ifap.ed.gov/fsahandbook/attachments/1415AVG.pdf (last visited Dec. 25, 2014). The guideline is:

> Student's household size (95). The following persons are included in the household size of an independent student:
> . . .
> Other persons **who live with** and receive more than half their support from **the student** and will receive more than half support for the entire award year. For FAFSAs submitted after the start of the year, see the relevant paragraph and example about legal dependents on page 25. (emphasis added)

2014 semester (per the Oct. 27, 2014 letter), jeopardizing his ability to complete the semester and

prepare for finals.  In fact, Financial Aid had all of the required information they needed before their

defamatory accusations and "verification process" and sought only to punish Alston for escalating his

requests to the PSU president and law school dean.

73. Although Alston provided the specific documentation required by Financial Aid on Nov. 10,

2014, Financial Aid still has not provided an answer to his request that his eldercare expenses be

deemed educational expenses, pursuant to the HEA and PSU's own stated policies.

74. Alston and his family continue to live in peril as they attempt to recover from spending

more than $10,000 in home health aide care for his mother and approximately $5,000 in transportation

expenses, using scarce funds that were previously devoted to other urgent needs.  As of the filing of this

document, Alston and his family are unaware of how they will survive much longer without being able

to budget the past expenditures as educational expenditures.

75. Alston's best option for surviving the next few months, while still caring for his mother, is

to leave school and seek employment.  Given his age and the ABA's requirement that full-time law

school students finish school within four years of commencing, Alston believes that he would never

return to law school should he be forced to withdraw.

### b. Specific interactions with Financial Aid.

76. We first demonstrate that the facts clearly support Alston's contention that his eldercare

expenses are educational expenses; that the Defendants had all necessary information to make that

determination on both Sept. 26, 2014 and Nov. 10, 2014; and that the Defendants possessed evidence of

the expenditures Alston has had to outlay in the absence of eldercare authorizations from PSU.

77. The requirements for eldercare to be included as educational expenses, according to

Bogart's Sept. 15, 2014 instructions are:

Elder care expenses, like childcare expenses, can possibly be included in the cost

3

of attendance, but only in the situation where the person for whom the care is being provided is the legal dependent of the student.

The IRS provides the following information on how to determine if a qualifying relative is indeed a dependent:

Qualifying Relative

Four tests must be met for a person to be your qualifying relative. The four tests are:

Not a qualifying child test,

Member of household or relationship test, Gross income test, and Support test.
The Gross Income Test and the Support Test are the ones that The Office of Student Aid would need documentation are met before we can consider your request for elder care expenses.

Please follow the links above to reference the IRS publication defining dependency.

78. On Sept. 26, after receiving the Sept. 15, 2014 instructions, Alston provided an affidavit and

documentation that demonstrated:

Four tests must be met for a person to be your qualifying relative. The four tests are:

Not a qualifying child test:
**Alston attested under penalty of perjury that Mrs. Morris is his mother, not his child.**

Member of household or relationship test:
**Alston attested under penalty of perjury that Mrs. Morris is his mother.**

Gross income test:
**Attested under penalty of perjury that he projected his mother's income to be $3,500 by the end of CY 2015.**

Support test:
**Attested under penalty of perjury that he provided his mother housing with fair rental value of $1,400/mo since 1998. He also attested that he had renovated her portion of the home for approximately $10,000 during summer/fall of 2015 (loan from family member). Paid HHA services of approximately $800/wk, though that amount varied. This accounted for more than 50% of her income for CY 2015.**

79. For the reasons indicated below, these calculations verified that his mother could be deemed

Alston's dependent.  He also documented from doctors' letters that his mother has serious medical

ailments and requires 24-hour care at home, that he works at least 80 hours/wk in her care and

commutes between Carlisle and Philadelphia to stay enrolled in school, while simultaneously helping

his mother.

80. Unfortunately, Financial Aid never commented directly on this documentation and never accepted this evidence as proof of his mother's dependent status.

81. Instead, Financial Aid wanted Alston to answer questions about where he and his mother lived, suggested that Alston "clarify" entries on his FAFSA, then deemed his truthful, subsequent changes to be contradictory and requiring of a formal verification process.  On Nov. 10, 2014, Alston completed 111-pages in response to the verification process in which he elaborated on his Sept. 26th affidavit with significant documentation and cites to IRS requirements as follows:

Four tests must be met for a person to be your qualifying relative. The four tests are:

Not a qualifying child test:
**Alston attested under penalty of perjury that Mrs. Morris is his mother, not his child.**

Member of household or relationship test:
**Alston attested under penalty of perjury that Mrs. Morris is his mother, which defines her as a qualifying relative, pursuant to IRS Pub 501 because, in part, there is an exception which holds that parents are not required to live with children to be deemed a qualifying relative.  Alston certified that he lived in Carlisle, which he declares his principal residence pursuant to IRS Pub 936, and that the home he provides for his mother is his second residence.**

Gross income test:
**Alston attests under penalty of perjury that his mother's gross income will be about $3,000 during the period of interest, July 1, 2014 thru June 30, 2015, excluding Social Security ($717/mo) and gifts ($500/mo), pursuant to IRS Pub 501.**

Support test:
**Alston attests under penalty of perjury that his contributions to his mother during the period of interest, July 1, 2014 thru June 30, 2015, will include an average of $1,800/mo in payments to HHAs, an average cash equivalent value of $3,360 in HHA services which Alston provides directly to his mother, $1,400 in fair rental value for housing, and $10,000 in improvements to her home.  He estimated that her total monthly support will be $8,860 of which he provides $7,393 or 83%.  This is greater than the required 50% support required by IRS Pub 501.  (Even if he excluded all support save the $1,800/mo HHA services for which he pays, he would still cover 55% of her support = $1800/$3,267).**

**CONCLUSION: His mother can be deemed his dependent during the period of interest, July 1, 2014 thru June 30, 2015.**

He provided full documentation for all of the above assertions.

82. Alston further provided detailed information regarding his mother's medical needs, including the requirement that he provide for her care on a 24-hour basis at home.

83. Consequently, Alston met all IRS requirements for his mother to be deemed his dependent. Alston further altered his FAFSA to be consistent with his just completed 2013 federal tax return and listing him as head of household, pursuant to IRS Pub 501.  (The IRS does not require a parent to live with his/her adult child in order for that child to declare the parent as a dependent or to file as head of household.)

84. The only response from Financial Aid occurred, indirectly, on Nov. 13, 2014.  They changed his household size on his FAFSA and reduced his number of dependents, without any justification in law or fact.  Should that act help to deprive Alston of his fundamental rights, it becomes yet another due process violation.

85. Pursuant to that unauthorized change to his FAFSA, Alston contends that Financial Aid completed its verification process on Nov. 13, 2014.  However, they have yet to disclose their findings, yet to alter his budget, and have yet to restore his financial aid, causing the plethora of bad outcomes for Alston and his family described herein.

### c. Identification of Alston's constitutional rights violated by the Defendants.

86. Alston has a fundamental right to engage in the legal profession as a lawyer, his successful completion of law school being a prerequisite.  Meyer v. Nebraska, 262 U.S. 390, 399, 43 S. Ct. 625, 626, 67 L. Ed. 1042 (1923) (holding that there is a fundamental right "to engage in any of the common occupations of life").  Alston has a fundamental right to contract to take out educational loans.  Id. (holding that there is a fundamental "right to contract").

87. Alston also has a property right in his continued enrollment as a law school student at PSU because his good standing and past payments create an expectation that he may continue as a student. Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548

18

(1972) ("To have a property interest in a benefit, a person clearly must have more than an abstract need

or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a

legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those

claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined."),

Alston has a fundamental right to the protection of his continued law school enrollment and $150,000

investment in his law school education against usurpation by PSU without compensation.  Fifth

Amendment (protection against takings without just compensation).

    88. Alston has a fundamental right and responsibility to protect the health and physical well-

being of himself and his family, including his 84-year-old severely ill mother.  Meyer, 262 U.S. at 399

(holding that there is a fundamental right to "establish a home . . . and generally to enjoy those

privileges long recognized at common law as essential to the orderly pursuit of happiness by free

men"); Ingraham v. Wright, 97 S. Ct. 1401, 1413, n.41, n.42 (1977) (holding that there is a fundamental

"freedom from unjustified intrusions on personal security"); Charles E. Shattuck, The True Meaning of

the Term "Liberty" in Those Clauses in the Federal and State Constitutions Which Protect "Life,

Liberty, and Property", 4 Harv. L. Rev. 365, 376-77 (1891) (defining the right of personal security from

the common law to include life, limb and health).

### d. How the infringements amounted to substantive due process violations justifying recovery.

    89. Substantive due process provides that the Due Process Clause of the Fourteenth Amendment

applies to the protection of all fundamental rights.  Lawrence v. Texas, 539 U.S. 558, 593, 123 S. Ct.

2472, 2491, 156 L. Ed. 2d 508 (2003) ("Our opinions applying the doctrine known as "substantive due

process" hold that the Due Process Clause prohibits States from infringing *fundamental* liberty

interests, unless the infringement is narrowly tailored to serve a compelling state interest."); Duncan v.

State of La., 391 U.S. 145, 154, 88 S. Ct. 1444, 1450, 20 L. Ed. 2d 491 (1968) ("the right . . . is a

fundamental right and hence must be recognized by the States as part of their obligation to extend due

process of law to all persons within their jurisdiction."); <u>Benton v. Maryland</u>, 395 U.S. 784, 794, 89 S.

Ct. 2056, 2062, 23 L. Ed. 2d 707 (1969) ("a fundamental ideal in our constitutional heritage . . . should

apply to the States through the Fourteenth Amendment"); <u>Palko v. State of Connecticut</u>, 302 U.S. 319,

325, 58 S. Ct. 149, 152, 82 L. Ed. 288 (1937) (holding that the due process clause requires states to

protect rights that are "the very essence of a scheme of ordered liberty, . . . a principle of justice so

rooted in the traditions and conscience of our people as to be ranked as fundamental.") (internal

quotation marks omitted).

90. The Defendants' actions represent state interference with Alston's fundamental rights

outlined above. That interference includes: (a) the unconscionable delays by the Financial Aid Office

of one year before providing the criteria for eldercare inclusion as an educational expense; (b) the

ongoing unconscionable delay of three months to determine whether the information presented by

Alston was sufficient for such a determination; (c) the fact that Alston has been and continues to be

denied the inclusion of his mother's eldercare expenses as educational expenses pursuant to the HEA;

(d) the fact that the October 27, 2014 letter placed an immediate hold on his financial aid, without

which he will be unable to complete his final semester beginning in January 2015, and threatens to

deny him aid, assertively, for the Spring 2015 semester. The delays, denials of aid, and promises to

continue the denials have forced Alston to be deprived of aid for the Spring 2015 semester, ending his

ability to attend law school; forced Alston to miss an inordinate number of classes, lowering his grades

and nearly terminating his ability to remain enrolled, adding massive uncertainty that has destabilized

him and his family and made it nearly impossible to learn his course material and compete against his

classmates.

91. There is no state interest that these infringements serve. If accuracy and fairness are the

purported state interests, the long delays and denials would serve neither because a student's financial

circumstances are likely to change from year to year or semester to semester. Further, these "practices"

actually preclude aid adjustments until a student has been injured by one or two semesters without the

aid or forced to withdraw.  Such practices do not guarantee accuracy or fairness.  If they do, then it is

clear that such a practice is hardly narrowly tailored and would render aid unworkable for any student

population.  In fact, the delays and denials do not arise according to any policy or regulation.  They are,

therefore, arbitrary and capricious.  The recent denials and the verification process are retaliatory, in

response to Alston's escalation of his requests to the PSU President and Dickinson Dean.  They are,

therefore, only pretextually related to any actual policies.  The lack of transparency and accountability

for publishing their procedures and processing completion dates are perfectly consistent with the failure

of the President and Dean to refuse to oversee Financial Aid actions and holding Bogart and Griswold

fully accountable for their failings.  The state interference with Alston's fundamental rights is a

collective effort among all Defendants because had any one of them decided to respect Alston's rights,

this law suit would not have been necessary.

92. Because this interference with Alston's due process rights vindicates no state interest, there

is no constitutional defense available to the Defendants.  Sweezy v. State of N.H. by Wyman, 354 U.S.

234, 254, 77 S. Ct. 1203, 1214, 1 L. Ed. 2d 1311 (1957) ("the infringement of constitutional rights of

individuals would violate the guarantee of due process where no state interest underlies the state

action"); Ingraham v. Wright, 430 U.S. 651, 672, 97 S. Ct. 1401, 1413, 51 L. Ed. 2d 711 (1977) ("Due

process is required only when a decision of the State implicates an interest within the protection of the

Fourteenth Amendment."); Meyer v. Nebraska, 262 U.S. 390, 399-400, 43 S. Ct. 625, 627, 67 L. Ed.

1042 (1923) ("The established doctrine is that this liberty may not be interfered with, under the guise of

protecting the public interest, by legislative action which is arbitrary or without reasonable relation to

some purpose within the competency of the state to effect.").

93. As well, PSU's delays and denials of aid are unrelated to academic decisions, so cannot be

excused pursuant to the academic freedom doctrine.  Regents of Univ. of Michigan v. Ewing, 474 U.S.

214, 226, 106 S. Ct. 507, 514, 88 L. Ed. 2d 523 (1985) ("federal court is . . . far less [] suited to

evaluate the substance of the multitude of academic decisions that are made daily by faculty members

of public educational institutions—decisions that require an expert evaluation of cumulative

information and [are] not readily adapted to the procedural tools of judicial or administrative

decisionmaking.") (internal quotations and citations omitted).

### e. How the infringements amounted to procedural due process violations justifying recovery.

94. To seek the procedural protections of the Fourteenth Amendment against state deprivation

of life, liberty or property, one must first establish that one of these interests is at stake.  Wilkinson v.

Austin, 545 U.S. 209, 221, 125 S. Ct. 2384, 2393, 162 L. Ed. 2d 174 (2005).  Above, we demonstrated

that Alston has a property interest in his continued enrollment as a law school student and his more than

$150,000 investment in law school; that he has a liberty interest in pursuing his chosen profession of

being a lawyer; and that his "life" interests include the right to protect the health and safety of his

family, including his mother, who requires 24-hour home healthcare.  Second, we must examine

whether the procedures applied to the deprivation complained of was constitutionally sufficient.

Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460, 109 S. Ct. 1904, 1908, 104 L. Ed. 2d 506

(1989).  In this regard, the Supreme Court requires application of the Mathews v. Eldridge balancing

test.  Wilkinson v. Austin, 545 U.S. at 224.

95. The three components of the Mathews v. Eldridge test that are to be balanced are: the

private interest affected by the official action, the risk of erroneous deprivation using the existing

procedures, and the state interest, including the burdens of additional or substitute procedures.

Mathews v. Eldridge,424 U.S. 319, 224-25 (1976).  Pursuant to the Mathews v. Eldridge test, Alston's

private interests are the life, liberty and property rights described above.  The state's procedural actions

used were a year of delays in providing Alston with knowledge of the criteria for eldercare inclusion in

educational expenses; an ongoing three-month delay in actually determining whether Alston's eldercare

expenses qualified as educational expenses; interpreting Alston's W-2 student income as the full extent

of income available for family support while ignoring Alston's financial aid that is used for that very

purpose; providing two very different and unrelated reasons that a verification process was required (Oct. 24 - that Alston changed answers on his FAFSA, Oct. 27 – that he could not support his mother on $200 of W-2 income); altering Alston's FAFSA on Nov. 13, 2014 improperly and without justification (Alston had properly listed himself the number of dependents he would declare); failing to notify Alston that the verification was complete on Nov. 13, 2014; failing to notify Alston of its decision as to eldercare inclusion from Nov. 13, 2014 to the present and failing to lift the suspension of his financial aid for the Fall 2014 and Spring 2015 semesters from Nov. 13, 2014 to the present.

96. The possible state interests in undertaking this series of delays, denials, and unjustified conclusions are difficult to fathom. But, for the sake of argument, we might hypothesize that PSU will argue that the procedures are for the purpose of ensuring accuracy and fairness in its decisions. However, these unconscionable delays of one year as well as three months are impermissibly long to accomplish the pedestrian tasks of instructing students on, approving, and disbursing financial aid, considering the fact that the aid is targeted for day-to-day expenses and no student on financial aid could be expected to meet those expenses otherwise without extreme and exceptional hardship. It is far more likely that a shocking level of incompetence and/or vindictiveness were the real reasons for the above procedures, not state interests. Hence, the state's interest in the above procedures, if any, do not justify them. Better procedures that would protect Alston's constitutional interests include timely notification of eldercare criteria, a hearing where Alston could present his evidence, reasonable and published deadlines for Financial Aid action on student requests, as well as accountability for missed deadlines. Such burdens on PSU would be negligible.

97. Hence, pursuant to the Mathews v. Eldridge test, the Defendants unconstitutionally deprived Alston of procedural due process and Alston was entitled to other, reasonable procedures.

### f. Relief requested.

98. We have demonstrated that the actions of the Defendants have violated and continue to violate Alston's substantive due process rights because they infringe fundamental rights and they violate Alston's procedural due process rights under the Fourteenth Amendment, pursuant to the Mathews v. Eldridge balancing test.

WHEREFORE Plaintiff respectfully demands as follows:

a. Declaratory relief in the form of a judicial determination that Alston:

    i.    Can lawfully declare his mother a dependent during the period July 1, 2014 thru June 30, 2015;

    ii.    Can lawfully list himself as head of household;

    iii.    Is entitled to have his transportation expenses deemed as educational expenses;

    iv.    Is entitled to have his dependent mother's medical and home health care expenses deemed educational expenses pursuant to the Higher Education Assistance Act;

    v.    Is deemed to have completed his financial aid forms diligently and consistent with the facts as he knew them;

    vi.    Is entitled to receive timely Financial Aid instructions and decisions;

    vii.    Is entitled to take his Fall 2014 exams again and to submit his papers again; and

    viii.    Has had his due process and equal protection rights violated by the activities of the Defendants and that these violations are ongoing.

b. Injunctive relief to prevent the Defendants from enforcing their unlawful and pretextual decision to deny him aid for the Spring 2015 semester;

c. Mandamus relief in the form of an order directing the Financial Aid Office to deliver Alston's eldercare financial aid and all Spring 2015 aid immediately, as well as the establishment of accountability, transparency, and quality control mechanisms for all contacts with students, especially those requesting information on borrowing criteria, procedural instructions, and cost

of attendance increases;

d. Any other relief which the learned Court deems just and proper.

## COUNT 2

### VIOLATION OF ALSTON'S EQUAL PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT

99. Paragraphs 1 thru 98 are incorporated by reference herein.

100.    As demonstrated in Count 1, the Defendants violated numerous of Alston's constitutional rights, inflicting significant medical, academic, financial, and emotional injury upon him, his 84-year-old ailing mother and the rest of his family.  Below, we identify additional constitutional violations and demonstrate why these violations are equal protection violations under the Fourteenth Amendment, justifying recovery.

### a. Specific interactions with Financial Aid.

101.    These actions are provided in Count 1.

### b. How constitutional infringements amounted to equal protection violations justifying recovery.

102.    The Equal Protection Clause requires that "all persons similarly circumstanced shall be treated alike."  F. S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920).  However, differences in fact or opinion can lawfully lead to differences in treatment.  Tigner v. Texas, 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940).  A court must determine, on the facts of the case, whether the discrimination complained of "reflects no policy, but simply arbitrary and capricious action."  Baker v. Carr, 369 U.S. 186, 226, 82 S. Ct. 691, 715, 7 L. Ed. 2d 663 (1962).

103.    In the instant matter, Bogart told Alston on Nov. 10, 2014 that he was not being singled out for poor treatment or retaliation.  This can be viewed as a tacit acknowledgement that all persons similarly situated to him would be treated similarly.  The class of persons to which Alston belongs, then, can be those students with elderly parents who seek to have their eldercare expenses deemed to be educational expenses.  This is analogous to Baker, in which the Supreme Court permitted a class to be

defined as those voters who were similarly victimized by a statute which produced disproportionate voting power. Id. at 705. The issue, then, is whether Alston's class is discriminated against for arbitrary and capricious reasons. Id. at 715.

104.    The specific treatment Alston's class suffered included the withholding of criteria for eldercare inclusion under the HEA for one year, Financial Aid taking three months to determine whether Alston's eldercare expenses actually qualified as educational expenses, the use of a formal verification process conflicting with finals period because Alston corrected his FAFSA pursuant to Financial Aid's instructions, the interpretation of his estimated student W-2 income of $200 as his only income, suspending his financial aid since October 27, 2014 and maintaining that suspension on an ongoing basis.

105.    Upon information and belief, Financial Aid does not subject students outside Alston's class to these actions.

106.    All of these above acts are arbitrary, capricious, inconsistent with Financial Aid's own regulations, and, therefore, cannot justify discriminative treatment of Alston's class. First, the regulations pursuant to the HEA were developed in 2010, so there was no credible reason for any delay in providing Alston the eldercare criteria. Robert S. Eitel & Kent D. Talbert, The U.S. Department of Education's Federal Student Aid Program Integrity Final Regulations, 12 Engage: J. Federalist Soc'y Prac. Groups 16 (2011) ("the Department published final regulations . . . on October 29, 2010"). Second, altering a FAFSA to reflect a future period is tax planning, was not creation of a "contradictory" record, and was required precisely because Financial Aid delayed providing Alston with eldercare criteria. The Defendants must be estopped from arguing that a verification was required when their own actions forced Alston to change his answers when he did, as opposed to providing them originally. Third, it was irrational and without basis to interpret W-2 income as Alston's sole income when Financial Aid knew that he was a financial aid recipient, taking out many thousands of dollars in loans each semester. As well, the fact that a FAFSA never indicates potentially significant rental and

investment income of insolvent students suggests that there is often more support income available. Fourth, the very fact that the Oct. 27, 2014 verification letter stated that the investigation would be complete in thirty days, but has been ongoing for sixty, is an example of an organization not following its own rules.  This amounts to an arbitrary action in the Third Circuit.  Skehan v. Bd. of Trustees, 501 F.2d 31, 38-39 (3d Cir. 1974) (holding that an organization that fails to follow its published procedures infringes constitutional property rights) cited in Students and Due Process in Higher Education: Of Interests and Procedures, 2 Fla. Coastal L.J. 243, 290 (2001).

107.    More troubling is that the Dept. of Ed. declares, when a student is picked for verifying potentially conflicting information, that the verification process is complete when the school determines which information is actually correct.[4]  Further, the Dept. of Ed. requires that a school alter a student's FAFSA as part of the verification process only **after** it has completed the verification.[5] Finally, the Dept. of Ed. requires that all use of professional judgment by Financial Aid be "reasonable."[6]  Since Financial Aid updated Alston's FAFSA on November 13, 2014, it must have completed its verification on or before that date.  Yet, it has still not informed Alston of the results of its verification, has not lifted its suspension of Alston's aid, has not granted an increase in educational budget for eldercare expenses, etc.  These actions cannot be considered reasonable and, therefore, are violations of the Dept. of Ed.'s policies.  Hence, either the Defendants have arbitrarily decided not to follow the Dept. of Ed.'s regulations by prematurely updating Alston's FAFSA or have arbitrarily not followed the Dept. of Ed.'s regulations by completing the verification and neither informing the student of the results nor funding Alston's eldercare expenses.  Both are equal protection violations.

---

[4] *FAFSA Application and Verification Guide*, supra note 2, at 126.
[5] Id. at 77 ("You must complete verification for a selected student before you exercise professional judgment to adjust any values that are used to calculate the EFC.").
[6] Id. at 122.

### c. Relief requested.

108.    We have demonstrated that the Financial Aid Office has violated Alston's due equal protection rights, as a student with eldercare responsibilities, under the Fourteenth Amendment because it arbitrarily and capriciously discriminates against his class of persons.

WHEREFORE Plaintiff respectfully demands as follows:

a. Declaratory relief in the form of a judicial determination that Alston:

    i.    Can lawfully declare his mother a dependent during the period July 1, 2014 thru June 30, 2015;

    ii.    Can lawfully list himself as head of household;

    iii.    Is entitled to have his transportation expenses deemed as educational expenses;

    iv.    Is entitled to have his dependent mother's medical and home health care expenses deemed educational expenses pursuant to the Higher Education Assistance Act;

    v.    Is deemed to have completed his financial aid forms diligently and consistent with the facts as he knew them;

    vi.    Is entitled to receive timely Financial Aid instructions and decisions;

    vii.    Is entitled to take his Fall 2014 exams again and to submit his papers again; and

    viii.    Has had his due process and equal protection rights violated by the activities of the Defendants and that these violations are ongoing.

b. Injunctive relief to prevent the Defendants from enforcing their unlawful and pretextual decision to deny him aid for the Spring 2015 semester;

c. Mandamus relief in the form of an order directing the Financial Aid Office to deliver Alston's eldercare financial aid and all Spring 2015 aid immediately, as well as the establishment of accountability, transparency, and quality control mechanisms for all contacts with students, especially those requesting information on borrowing criteria, procedural instructions, and cost of attendance increases;

d. Any other relief which the learned Court deems just and proper.

## COUNT 3
## VIOLATIONS ACTIONABLE UNDER SECTION 1983

109.   Paragraphs 1 thru 108 are incorporated by reference herein.

110.   As demonstrated in Counts 1 and 2, the Defendants violated numerous of Alston's constitutional rights, inflicting significant medical, academic, financial, and emotional injury upon him, his 84-year-old ailing mother and the rest of his family.  Below, we identify how the Defendants' constitutional violations create actionable claims under Section 1983, justifying recovery.

### a. Specific interactions with Financial Aid.

111.   These actions are provided in Count 1.

### b. How constitutional infringements permit claims under Section 1983, justifying recovery.

112.   Section 1983 permits courts to grant relief when federally protected rights have been violated by persons acting under color of state law, including "any rights, privileges or immunities secured by the Constitution." 42 U.S.C. § 1983.  See also Lynch v. Household Fin. Corp., 405 U.S. 538, 547, 92 S. Ct. 1113, 1120, 31 L. Ed. 2d 424 (1972).  Property rights are civil rights actionable under Section 1983.  Id. at 543-45.  Pursuant to the discussion above, the following of Alston's constitutional rights, infringed by the Defendants, are actionable under Section 1983:

    a.  Equal protection violations stemming from the arbitrary and capricious acts of Bogart and the Financial Aid Department to ignore their own procedures and standards and to apply discriminatory standards to the class of persons who seek to deem eldercare expenses as educational expenses, all to Alston's detriment;

    b.  His substantive due process rights, including engaging in the legal profession as a lawyer, for which law school is a prerequisite; his right to protect the lives and health of himself and his ailing mother; his right to contract to take out educational loans; protection of his property right in his continued enrollment as a law school student

and in his more than $150,000 investment in law school, including the Fifth

Amendment protections against property seizure without just compensation;

   c.   His procedural due process rights.

113.   As demonstrated above, the Defendants are all persons within the meaning of Section

1983; PSU, the Trustees, Dickinson, and the Financial Aid Office are all state actors under Section

1983.  Their employees, Barron, Bogart, Griswold, and Gildin, all responded to Alston's emailed

financial aid requests and made decisions within the scope of their respective authority as employees

on Alston's financial aid matters.  Hence Barron, Bogart, Griswold, and Gildin are also state actors

whose actions place them under the auspices of Section 1983.  Adickes v. S. H. Kress & Co., 398 U.S.

144, 152, 90 S. Ct. 1598, 1605, 26 L. Ed. 2d 142 (1970) ("The involvement of a state official in such a

conspiracy plainly provides the state action essential to show a direct violation of petitioner's

Fourteenth Amendment equal protection rights, whether or not the actions of the police were officially

authorized, or lawful").

114.   Bogart's decisions, as described by her emails, were the direct and immediate cause of

all deprivations Alston experienced.  Griswold, Barron, and Gildin all received emails from Alston in

which he pleaded with them to override Bogart's power and decision-making authority with respect to

his financial aid because Bogart had consistently failed to act in a timely, competent matter, and Alston

was suffering unconscionable deprivations as a result.  In each case, these employees ignored Alston's

injury, refused to intervene, and actually *referred Alston back to Bogart*.  Had any of the Defendants

interceded, then the injury to Alston and his mother would have ceased immediately.  Hence, the

Defendants were the **proximate** and **but-for** causes of the constitutional violations.

115.   Since we have shown that state actors acting under color of state law infringed Alston's

Fourteenth Amendment rights, Section 1983 is available as a remedy.  Gomez v. Toledo, 446 U.S. 635,

640, 100 S. Ct. 1920, 1923, 64 L. Ed. 2d 572 (1980) ("By the plain terms of § 1983, two-and only two-

allegations are required in order to state a cause of action under that statute.  First, the plaintiff must

allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law.").

### c. Relief requested.

116.     We have demonstrated that the Financial Aid Office has violated Alston's due process and equal protection rights under the Fourteenth Amendment, hence this Court may order a remedy, pursuant to Section 1983.

WHEREFORE Plaintiff respectfully demands as follows:

a. Declaratory relief in the form of a judicial determination that Alston:

    i.    Can lawfully declare his mother a dependent during the period July 1, 2014 thru June 30, 2015;

    ii.    Can lawfully list himself as head of household;

    iii.    Is entitled to have his transportation expenses deemed as educational expenses;

    iv.    Is entitled to have his dependent mother's medical and home health care expenses deemed educational expenses pursuant to the Higher Education Assistance Act;

    v.    Is deemed to have completed his financial aid forms diligently and consistent with the facts as he knew them;

    vi.    Is entitled to receive timely Financial Aid instructions and decisions;

    vii.    Is entitled to take his Fall 2014 exams again and to submit his papers again; and

    viii.    Has had his due process and equal protection rights violated by the activities of the Defendants and that these violations are ongoing.

b. Injunctive relief to prevent the Defendants from enforcing their unlawful and pretextual decision to deny him aid for the Spring 2015 semester;

c. Mandamus relief in the form of an order directing the Financial Aid Office to deliver Alston's eldercare financial aid and all Spring 2015 aid immediately, as well as the establishment of accountability, transparency, and quality control mechanisms for all contacts with students,

especially those requesting information on borrowing criteria, procedural instructions, and cost of attendance increases;

d. Any other relief which the learned Court deems just and proper.

## COUNT 3
## NEGLIGENCE

117.    Paragraphs 1 thru 116 are incorporated by reference herein.

118.    The Defendants have a fiduciary duty and duty of care stemming from their roles in public education.  It was neither too far nor too remote for each of the Defendants to foresee that the consequences of failing to execute their duties by ensuring that Alston was awarded eldercare expenses as part of his educational budget on a timely basis would include financial, academic, mental health, and physical health collapses for Alston and his family.

119.    Bogart breached her duties by negligently failing, for a year, to provide Alston with the criteria for including his eldercare expenses as educational expenses, negligently ordering a verification process after she had encouraged Alston to change his FAFSA answers, and her negligence in delaying providing Alston with eldercare criteria, effectively denying him the tax planning opportunity that led to his original FAFSA answers; negligently ordering a verification process when she provided multiple and inconsistent reasons for requiring the verification process; negligently interpreting Alston's FAFSA; negligently delaying her evaluation of Alston's eldercare expenses for three months; negligently altering Alston's FAFSA either before she exercised her professional judgment regarding Alston's eldercare expenses or negligently failing to inform Alston of her decision for six weeks and counting; negligently concluding and informing administrators and peers that Alston had falsely claimed that his mother could be deemed his dependent, defaming him.  The other Defendants breached their respective duties of care by negligently supervising Bogart, negligently training Bogart, negligently failing to intervene to remove Bogart from Alston's financial aid requests and replacing her with a competent financial aid officer when Alston demonstrated that she was negligently performing

her job.

120.     The Defendants have legal responsibility for all of the financial aid decisions of which Alston complains and all of Alston's injuries were known to them before they breached their duties because Alston made them all aware.  Hence, the Defendants are all the proximate cause of Alston's injuries.  All defendants are the but-for cause of Alston's injuries because had any one of them corrected Bogart's negligent acts, Alston would have ceased being injured.  The injuries Alston suffered are cataloged above.

WHEREFORE Plaintiff respectfully demands as follows:

a. Declaratory relief in the form of a judicial determination that Alston:

    i.    Can lawfully declare his mother a dependent during the period July 1, 2014 thru June 30, 2015;

    ii.    Can lawfully list himself as head of household;

    iii.    Is entitled to have his transportation expenses deemed as educational expenses;

    iv.    Is entitled to have his dependent mother's medical and home health care expenses deemed educational expenses pursuant to the Higher Education Assistance Act;

    v.    Is deemed to have completed his financial aid forms diligently and consistent with the facts as he knew them;

    vi.    Is entitled to receive timely Financial Aid instructions and decisions;

    vii.    Is entitled to take his Fall 2014 exams again and to submit his papers again; and

    viii.    Has had his due process and equal protection rights violated by the activities of the Defendants and that these violations are ongoing.

b. Injunctive relief to prevent the Defendants from enforcing their unlawful and pretextual decision to deny him aid for the Spring 2015 semester;

c. Mandamus relief as in Counts 1-3;

d. Any other relief which the learned Court deems just and proper.

## COUNT 4
## DEFAMATION

121.   Paragraphs 1 thru 120 are incorporated by reference herein.

122.   This will be described in an amendment, due to the urgent nature of the Complaint.

## COUNT 5
### Intentional Infliction of Emotional Distress

123.   Paragraphs 1 thru 122 are incorporated by reference herein.

124.   This will be described in an amendment, due to the urgent nature of the Complaint.

## COUNT 6
### Negligent Infliction of Emotional Distress

125.   Paragraphs 1 thru 124 are incorporated by reference herein.

126.   This will be described in an amendment, due to the urgent nature of the Complaint.

## COUNT 7
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
## AND THE REHABILITATION ACT

127.   Paragraphs 1 thru 126 are incorporated by reference herein.

128.   This will be described in an amendment, due to the urgent nature of the Complaint.

**I declare under penalty of perjury that the foregoing is true and correct.**

Dated: Philadelphia, PA            /s/ Alson Alston
       December 29, 2014            _____
                                  (Signature)
                      146 S. Pitt Street
                      Carlisle, PA 17013
                      Phone: 904-444-0311

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Alson Alston,
                    Plaintiff,

            – against –

The Pennsylvania State University,
The Trustees of The Pennsylvania State
University,
Eric J. Barron, as President of The Pennsylvania
State University,
The Dickinson School of Law of The
Pennsylvania State University,
Gary S. Gildin, as Dean of Dickinson School of
Law of The Pennsylvania State University,
Office of Student Aid of the Pennsylvania State
University,
Anna M. Griswold, as Executive Director of
Student Aid at The Pennsylvania State University,
and
Susan A. Bogart, as Director of Financial Aid at
the Dickinson School of Law of The Pennsylvania
State University,
                    Defendants.

Civil Action No.: 14-cv-2480
Judge Caldwell



FILED

DEC      2014

PER
HARRISBURG, PA      DEPUTY CLERK

## AFFIRMATION OF SERVICE

I, Alson Alston, declare under penalty of perjury that I have served a copy of the attached

Complaint, Civil Cover Sheet, Affirmation of Service, Notice of a Lawsuit and Request to Waive

Service of a Summons (8 forms covering all Defendants), and Waiver of the Service of a Summons a

Summons (8 forms) upon the Defendants at the addresses listed below, by email:

> John A. Snyder, Esq., McQuaide Blasko, 811 University Dr., State College, PA 16801
> Counsel for Defendants
> Email: jasnyder@mqblaw.com, Phone: 814-238-4926

**I declare under penalty of perjury that the foregoing is true and correct.**

Dated: Philadelphia, PA          /s/ Alson Alston
          December 29, 2014       _____
                                              (Signature)
                                  146 S. Pitt Street
                                  Carlisle, PA 17013
                                  Phone: 904-444-0311

SHIP
TO:

SHIP CLERK
US DISTRICT COURT - MDPA
228 WALNUT

HARRISBURG  PA  17108-2586

UPS NEXT DAY AIR SAVER

PA 171 9-20

1P

UPS TRACKING #: 1Z 170 X00 13 5075 2675

BILLING: P/P

DEC 30

PB PHR821
US DISTRICT COURT -
228 WALNUT
HARRISBURG PA 17108-9901

S: TBLUE   T: B52
72C-2240  2675   1500
1Z170X0013507G
PB PHR821   HIP 14.3.1
HARRHRC   1711   US
DEC 30 05:03:51 2014   ZEBRAZM400

Visit ups.com® or call 1-80
to schedule a pickup or find

**Domestic Shipments**
· To qualify for the Letter rate, UPS Ex
correspondence, urgent documents,
weigh 8 oz. or less. UPS Express En
those listed or weighing more than

**International Shipments**
· The UPS Express Envelope may be u
value. Certain countries consider eli
ups.com/importexport to verify if y

ISH 13.00N:E2844 57.SV 10/2014

010195101   1/10  PAC United Parcel Service, Louisvill

International Shipping Notice — Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or the Convention on In
Contact for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.

r use with the following services:

UPS Next Day Air®
UPS Worldwide Express℠
UPS 2nd Day Air®

Do not use this envelope for:

UPS Ground
UPS Standard
UPS 3 Day Select®
UPS Worldwide Expedited®

Apply shipping documents on this

80% Post-Consumer