**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ALSON ALSTON,** | : | **Civil No. 1:14-CV-2480** |
| | : | |
| **Plaintiff** | : | **(Judge Kane)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **THE PENNSYLVANIA** | : | |
| **STATE UNIVERSITY, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

A central question presented in this action is whether a law student has substantive and procedural due process rights with respect to the procurement of student loans used to finance his professional school education, and more specifically whether that student has a private right of action under federal law to force a university to grant him additional student loans that he claims he needed to provide elder care for his mother.   Relatedly, we must consider whether a plaintiff's disagreement with university officials over their handling of his student financial aid requests gives rise to a claim for discrimination under Federal disability laws, or to viable tort claims under Pennsylvania law.   Because we find that the plaintiff's frustration with the processing of his student loans does not rise to the level of a

federal cause of action, much less one of constitutional dimension; and because the plaintiff's amended complaint does not plausibly allege facts to support claims for discrimination or tortious conduct, it will be recommended that this case be dismissed.

At the time he initiated this action, Alson Alston ("Alston" or the "plaintiff"), was a 50 year-old third-year law student at The Pennsylvania State University-Dickinson School of Law ("Penn State"). Alston alleges that in addition to his work as a law student, he provides primary financial and home-health care support for his mother, an 84 year-old widow who has a number of serious medical needs including diabetes, hypertension, osteoarthritis, Graves disease, kidney cancer, dementia, and a loss of motor skills following a stroke. (Am. Compl., ¶ 1.) Alston alleges that his mother requires 24-hour, in-home care, which Alston and his sister provide directly and through the use of home health aides. (Id.) Alston alleges that these health-care expenses qualify as educational expenses under the Higher Education Act ("HEA") of 1965, 20 U.S.C. §§ 1070 *et seq*.

To help manage his educational expenses and his mother's needs, Alston had sought increased student financial aid ("SFA") for personal transportation costs, personal health needs, and for elder care expenses that he claimed he required to travel back and forth between Philadelphia and Carlisle. (Id., ¶¶ 18, 21-22.) When

2

his requests were not immediately acted upon or granted, Alston asked that his request for additional SFA receive peer review or professional judgment in November 2013.[1] (Id., ¶ 22.) Defendant Susan Griswold, the Executive Director of Student Aid at Penn State, reviewed Alston's aid in February 2014. (Id., ¶ 23.) Penn State rejected his request for additional funds, finding that Alston had not supported his request sufficiently, and Alston brought suit. Alston challenges the defendants' refusal to approve his requests for additional SFA based upon his mother's alleged elder care needs, pursuant to Title IV of the HEA. (Id., ¶¶ 2-3.) He further alleges that the defendants unreasonably delayed and ultimately denied his request in a manner that violated his rights to procedural and substantive due process, and his right to equal protection guaranteed by the Fourteenth Amendment. Alston further alleged that the defendants violated the Americans with Disabilities Act and the Rehabilitation Act, and that their conduct was tortious under Pennsylvania law.

---

[1] Peer review or professional judgment are requests made to administrators to review a student's application and, if appropriate, exercise professional judgment to alter the award. 20 U.S.C. §§ 1087tt.

3

II.   **BACKGROUND**[2]

Alston enrolled at Penn State as a second-year transfer student in June 2013. (Am. Compl., ¶ 17.)  On October 4, 2013, Alston requested an increase in his SFA borrowing authority to help cover the additional transportation and elder care expenses that he was going to be incurring in order to manage his mother's health needs.  (Id., ¶ 18.)   In early November 2013, Alston's mother's health was deteriorating, and he rushed her to the hospital where he was told that she had a number of quite serious medical conditions, including cancer, high blood pressure, and osteoarthritis.  (Id., ¶ 19.)   One day later, on November 11, 2013, Alston requested information on how he can qualify his elder care expenses as educational expenses.  (Id., ¶ 20.)

On November 19, 2013, Susan Bogart, the Director Financial Aid at the law school, provided Alston with instructions for qualifying his personal transportation and health care needs as educational expenses, but did not inform Alston about how to qualify elder care expenses for his mother.  On November 22, 2013, Alston provided documents to support his request for transportation and elder care expenses, and he requested peer view of his request for increased SFA.  (Id., ¶¶ 21-22.)

_____

[2]  The background to this report and recommendation is taken from the well-pleaded allegations set forth in the amended complaint, and which are accepted as true for purposes of considering the defendants' motion to dismiss only.

On February 14, 2014, Alston was offered an additional $200 in borrowing authority, but was denied any additional financial assistance pending the submission of supporting information from medical professionals.   Between February 19 and February 24, 2014, Alston provided four additional letters from medical professionals to verify his own personal medical needs and also that his mother will require his assistance indefinitely.  (Id., ¶¶ 23-24.)  After notifying his professors that he would be removing himself from school due to his desperate circumstances, Alston received emergency loan proceeds on March 3, 2014, permitting him to remain in his classes. (Id., ¶¶ 25-27.)

As the semester drew to a close, Alston meet with Bogart to discuss his summer semester living budget.  At that time, Bogart told Alston that he has been approved a budget of just under $9,000, and Alston planned accordingly based on that figure. (Id., ¶ 28.)  In June, however, Bogart told Alston that she miscalculated his award, and instead told him that he would be receiving just $6,120 in summer living expenses, all of which would be disbursed as loans.  (Id., ¶ 29.)

In mid-July Alston told Bogart that his mother had a stroke, and provided documentary evidence to show that he must provide 24-hour in-home care for her. He asked Bogart how his educational budget could be adjusted to reflect his new responsibilities as a student and caregiver.   At this point, Alston alleges that he

embarked on a frustrating saga with Penn State officials, which took months, involved repeated requests by school officials for additional documentation that Alston provided, and eventually resulted in Alston submitting more than 100 pages of documentation to support his request for an increase in his SFA allowance.  Alston claims that the SFA process has never actually resolved, and he alleges he has never been informed about whether he would be granted SFA for the spring semester in 2015.  During his time as a student, Alston has borrowed more than $150,000 to pay for tuition and other expenses, and he alleges that if Penn State does not reimburse him for additional amounts he has been forced to borrow to pay for health care for his mother, he will find himself unable "to make payments required by his tax planning strategy . . . . causing disastrous consequences."  (Id., ¶¶ 30-59.)  Throughout a somewhat prolix and emphatic amended complaint, Alston thus details his frustrating experience attempting to obtain additional SFA to help finance his education and his increased responsibility for his mother's care, as well as his own medical challenges, and alleges that his treatment by the defendants violated his rights under federal and state law.  He seeks damages, as well as declaratory and injunctive relief.

The defendants have moved to dismiss the amended complaint, arguing that Alston has no substantive due process right to student loans or to a higher education at all, and that he has not articulated a procedural due process violation arising out of

the handling of his SFA requests.  Likewise, the defendants maintain that Alston has

not pleaded the necessary elements to support an equal protection violation, and has

failed to state a claim for violations of the Americans with Disabilities Act or Section

504 of the Rehabilitation Act, or for any tort under Pennsylvania law.

For his part, Alston has offered little in the way of a brief opposing the

defendants' motion.  Instead, Alston sought two enlargements of time in which to file

a brief, and then filed a document that offered no substantive legal analysis or

support, but instead merely stated that Alston opposes the motion, and that he has

been unable to find the time to prepare a substantive response because he was

completing course work and was otherwise busy.  Alston expressed his hope that he

would "file additional argument in the next few days, if possible," but no such

argument as been forthcoming.  Because the defendants' motion has been pending

since March 2015, and because the law compels judgment in the defendants' favor,

we find that it is now appropriate for the Court to consider the defendants' motion

and dismiss this action.

## III.   <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a

complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief

can be granted.  The moving party bears the burden of showing that no claim has been

stated, <u>Hedges v. United States</u>, 404 F.3d 744, 750 (3d Cir.2005), and dismissal is

appropriate only if, accepting all of the facts alleged in the complaint as true, the

plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on

its face," <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007) (abrogating "no

set of facts" language found in <u>Conley v. Gibson</u>, 355 U.S. 41, 45–46 (1957) ).  The

facts alleged must be sufficient to "raise a right to relief above the speculative level."

<u>Twombly</u>, 550 U.S. 544, 555.  This requirement "calls for enough fact[s] to raise a

reasonable expectation that discovery will reveal evidence" of necessary elements of

the plaintiff's cause of action.  <u>Id.</u> at 556.  Furthermore, in order to satisfy federal

pleading requirements, the plaintiff must "provide the grounds of his entitlement to

relief," which "requires more than labels and conclusions, and a formulaic recitation

of the elements of a cause of action will not do."  <u>Phillips v. County of Allegheny</u>,

515 F.3d 224, 231 (3d Cir.2008) (brackets and quotations marks omitted) (quoting

<u>Twombly</u>, 550 U.S. 544, 555).

In practice, consideration of the legal sufficiency of a complaint entails a three-

step analysis:  "First, the court must 'tak[e] note of the elements a p[arty] must plead

to state a claim.'  <u>Iqbal</u>, 129 S.Ct. at 1947.  Second, the court should identify

allegations that, 'because they are no more than conclusions, are not entitled to the

assumption of truth.'  <u>Id.</u> at 1950.  Finally, 'where there are well-pleaded factual

8

allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.' Id." Santiago v. Warminster Tp., 629 F.3d 121, 130 (3d Cir. 2010).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. Sands v. McCormick, 502 F.3d 263, 268 (3d Cir.2007). The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir.1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir.2002); see also U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002) (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment."). However, the court may not rely on other parts of the record in determining a motion to dismiss. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994).

## IV.   **DISCUSSION**

### A.   **Student Financial Aid**

In their motion to dismiss, the defendants have aptly summarized the SFA framework under Title IV of the Higher Education Act.  Under that Act, the United States Department of Education ("DOE") authorizes Penn State to administer SFA pursuant to a provider agreement.  34 C.F.R. § 668.14.  The provider agreement obligates Penn State to follow the statute and regulations in administration of the SFA.  Id.  If Penn State were to fail to comply, it could be suspended, and its provider agreement could be terminated, which would impair its ability to provide SFA to its students.   34 C.F.R.  §  668.85(a)(1).   Although  the  HEA  provides  certain administrative remedies against the DOE in some limited circumstances, 20 U.S.C. § 1082(a)(2), it has long been recognized that individuals do not have a private right of action under the HEA against a university or the DOE.  Thomas M. Cooley Law Sch. v. Am Bar Ass'n, 459 F.3d 705, 710-11 (6th Cir. 2006), cert. denied, 549 U.S. 1116 (2007); Slovinec v. DePaul University, 332 F.3d 1068, 1069 (7th Cir. 2003); McCulloch v. PNC Bank Inc., 298 F.3d 1217, 1224-25 (11th Cir. 2002); Labickas v. Arkansas State University, 78 F.3d 333, 334 (8th Cir. 1996); Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484-85 (9th Cir. 1995); Gibbs v. SLM Corp., 336 F.

Supp. 2d 1 (D. Mass. 2004); <u>Jackson v. Culinary Sch. of Washington</u>, 788 F. Supp. 1233 (D.D.C. 1992).

### B.    Substantive Due Process

Perhaps recognizing that the HEA does not afford him a private right of action against Penn State or its employees, Alston attempts claim that the alleged mishandling of his SFA requests violated his right to substantive and procedural due process as guaranteed by the Fourteenth Amendment.  In this regard, however, Alston misapprehends the scope of the Fourteenth Amendment, and falls far short of stating plausible due process claims in any event.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Although the text of the Amendment is directed at the adequacy of state procedures, the Supreme Court has held that the clause also has a substantive element.  <u>See</u> <u>Nicholas v. Penn. State Univ.</u>, 227 F.3d 133, 139 (3d Cir. 2000) (citing <u>Planned Parenthood of S.E. Pennsylvania v. Casey</u>, 505 U.S. 833, 846-47 (1992) ("it is settled that the due process clause of the Fourteenth Amendment applies to matters of substantive law as well as to matters of procedure") (quoting <u>Whitney v. California</u>, 274 U.S. 357, 373 (1927) (Brandeis, J., concurring)).

In <u>Nicholas</u>, the Third Circuit explained that substantive due process is an area of law that is in some ways opaque, but the court identified two separate and quite different strands of substantive due process that have come to be recognized.  The first of these strands relates to substantive due process challenges to the validity of a legislative act, and in such cases "a legislative act will withstand substantive due process challenge if the government 'identifies a legitimate state interest that the legislature could rationally conclude was served by the statute,'" although some fundamental rights may give rise to stricter scrutiny.  <u>Id.</u>  This thread of substantive due process jurisprudence is entirely inapplicable to Alston's claims in this case.

The second strand of substantive due process protects against non-legislative action or exercise of power that is a deliberate and arbitrary abuse of authority.  <u>Id.</u> For example, the Third Circuit has held that "a property interest that falls within the ambit of substantive due process may not be taken away by the state for reasons that are 'arbitrary, irrational, or tainted by improper motive.' or by means of government conduct so egregious that it 'shocks the conscience.'"  <u>Id.</u> (internal citations omitted). The first step in determining whether a plaintiff has articulated a cognizable substantive due process claim, therefore, is to consider whether the plaintiff has alleged a recognized as a protected property interest to which the Fourteenth Amendment's due process protections apply.  <u>Id.</u> at 139-40 (citing <u>Woodwind Estates,</u>

Ltd. v. Gretkowski, 205 F.3d 118, 123 (3d Cir. 2000). The Fourteenth Amendment identifies "property" without any qualifications, "and it is well-settled that state-created property interests, including some contract rights, are entitled to protection under the procedural component of the Due Process Clause." Id. at 140. However, "to state a substantive due process claim, 'a plaintiff must have been deprived of a *particular quality* of property interest.'" Id. (quoting DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d 592, 598 (3d Cir. 1995) (emphasis added in Nicholas).

Thus, not every conceivable property right is entitled to the protection of substantive due process. Whereas procedural due process protects property interest even where the interest is derived solely from state law, substantive due process rights are created only by the Constitution itself. Id. (citing Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 229-30 (1985) (Powell, J., concurring)). Guided in this way, the Third Circuit has been "reluctant to extend substantive due process protection to other, less fundamental property interests aside from real property ownership. Id. In addition to property interests, the Supreme Court has observed that "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." Albright v. Oliver, 510 U.S. 266, 272 (1994). More recently, the Third Circuit indicated that it would "reserve[] consideration of the [substantive due process] doctrine for cases involving

13

the most intimate of family, privacy, and personal autonomy." <u>Armbruster v.</u>
<u>Cavanaugh</u>, 410 Fed. App'x 564, 568 (3d Cir. 2011).

The question in this case is thus whether Alston has articulated a property
interest, or such a particularly fundamental interest, in obtaining student financial aid
for his professional education and the concomitant care for his mother so as to state
an interest that is subject to substantive due process protection.  Upon consideration,
we believe it is clear that Alston has no such constitutionally protected substantive
due process interest, either with respect to obtaining an education, or in obtaining
sufficient financial aid to finance that education.

The Third Circuit has previously indicated that a graduate student's interest in
continued academic enrollment was not a sufficiently fundamental interest as to
trigger substantive due process protections.  <u>See</u> <u>Mauriello v. University of Medicine</u>
<u>& Dentistry of N.J.</u>, 781 F.2d 46 (3d Cir. 1986).  Following this decision, courts have
found that the Third Circuit has "strongly suggested that the right to continued
graduate education is not protected by substantive due process." <u>Kadakia v. Rutgers</u>,
No. 13-2450, 2015 WL 1310276, *5 (D.N.J. Mar. 24, 2015) (quoting <u>McMahon v.</u>
<u>Rutgers</u>, 2013 WL 5937416, *9 (D.N.J. Nov. 4, 2013)); <u>see also</u> <u>Manning v. Temple</u>
<u>Univ.</u>, 157 F. App'x 509, 514 (3d Cir. 2005); <u>Mucci v. Rutgers</u>, No. 08-4806, 2011
WL 831967, *18 (D.N.J. Mar. 3, 2011) (noting that the Supreme Court has not

14

recognized "a constitutionally protected property or liberty interest in completing a professional program of study.")  Other courts have similarly found that individuals have no constitutionally protected interest in obtaining financial aid to pay for professional school.  See, e.g., Robinett v. Delgado Community College, No. No. 99-2545, 2000 WL 1720553, at *__ (E.D. La. 2000) ("The Higher Education Act does not create a property right entitled to due process protection in students like Robinette who seek federal financial aid to attend a community college," and "no property right entitlement to federal financial assistance for students.").

Against this rising tide of authority, Alston has offered nothing of substance to support his view that his mere interest in obtaining a professional degree is entitled to substantive due process protection, or that his related interest in obtaining increased student financial aid is subject to such constitutional safeguards, and the case law is plainly to the contrary.  Instead, Alston contends that he had a protected property right to engage in the legal profession (Am. Compl., ¶ 90), and even a right to remain enrolled as a law student at Penn State (id., ¶ 91), and a general right to protect himself and his family.  (Id., ¶ 92).  Alston's legal authority for this proposition is scant, has been discredited, and simply does not fit the facts of this case in any event.  Nothing about the allegations suggests that Penn State or any of the defendants have infringed on Alston's alleged right to practice law, or obtain an

15

education, or protect his family; instead, the allegations indicate that Alston sought

additional student aid to take care of his mother, and that this request was denied

because officials found that Alston has not adequately demonstrate that he was

eligible.  None of Alston's arguments, limited as they are, are credible or persuasive,

and they fly in the face of settled substantive due process principles.  In short, while

we can appreciate Alston's interest in obtaining these educational benefits, that

interest simply does not translate into a fundamental constitutional right that is

entitled to substantive due process protection.  It is recommended, therefore, that

Alston's substantive due process claim be dismissed.

### C.    Procedural Due Process

Alston also claims that the handling of his student financial aid requests was

so bungled as to have violated his right to procedural due process as well.  As with

his substantive due process claims, Alston misapprehends the scope of procedural due

process, misapplies it to his circumstances, and fails to allege facts that articulate a

cause of action for any asserted violation of the Fourteenth Amendment.

To maintain a claim for a procedural due process violation, a plaintiff must

plead facts that are sufficient to show two elements:  (1) that he was deprived of an

individual interest that is encompassed within the Fourteenth Amendment's

protection of "life, liberty, or property" and (2) the procedures available to him did

not provide "due process of law." <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 233-34 (3d Cir. 2006) (citing <u>Alvin v. Suzuki</u>, 227 F.3d 107, 116 (3d Cir. 2000)).

In contrast to claims based upon the substantive due process protections of the Fourteenth Amendment, which are exclusively grounded in the Constitution, procedural due process extends to property rights created by state or federal law. The right that Alston seems to be claiming here is a right to be provided additional student financial aid, which he claims he was entitled to under the HEA in order to care for his or his mother's medical needs. Regardless of what the HEA may provide in terms of the bases upon which students may obtain funding, and regardless of how qualified student aid is defined under the Act, the question here is whether Alston had a protected due process right to receive additional student financial aid, and we find no support for that claim. Indeed, the Third Circuit has indicated that student borrowers not only have no protected right to have their loans not go into default, but they do "not have a property interest in receiving additional federal grants or loans." <u>Bridgeforth v. Am. Educ. Servs.</u>, 412 F. App'x 433, 436 (3d Cir. Feb. 14, 2011) (also holding that the district court did not abuse its discretion by denying the plaintiff leave to amend, since amendment would have been futile); <u>Bridgeforth v. Schenectady County Community College</u>, No. 11-0434, 2012 WL 893485, at *2 (N.D.N.Y. Mar. 15, 2012) (following the Third Circuit's decision in <u>Bridgeforth,</u>

17

supra, and dismissing plaintiff's due process claims based upon a claimed right to continue receiving funds to finance his education); see also De Journett v. Block, 799 F.2d 430, 431 (8th Cir. 1986) (finding the plaintiffs had no constitutionally protected interest in obtaining future agricultural loans, even if they had received FmHA loans in the past); Waugh v. Connecticut Student Loan Foundation, 966 F. Supp. 141, 143-44 (D. Conn. 1997) (denial of student loan application not a violation of due process, since the plaintiff had no entitlement to unapproved loan proceeds); Dozier v. Loop College, City of Chicago, 776 F. 752, 753 (7th Cir. 1985) (holding that there is no substantive right to a subsidized education through secondary school or college).

In addition to failing to identify a protected interest in obtaining student loans or in the financing of his professional education, Alston has also not identified what procedures, if any, he believes were lacking with respect to Penn State's review of his loan applications and requests.  He essentially takes issue with the fact that Penn State ultimately declined his request for additional funds, or the funds he believed he was entitled to receive, (Am. Compl. ¶ 2), but other than generally to express frustration at the length of time the review took, or the demands placed upon him during the review process, he does not adequately challenge the procedures themselves.

Had Alston identified specific procedures that he claims were violated, we may have had to consider whether those procedures were adequate.  But here, Alston has

alleged facts that seem to indicate he received substantial due process in accordance with a robust practice that considered Alston's requests, and solicited from him information necessary for the University to consider and act upon his requests. Thus, Alston alleges that he applied for elder care aid on September 14, 2014. (Am. Compl., ¶¶ 3, 33.) He supplemented his application in the coming months. (Id.) At this time, Penn State informed him that his reported household size and his mother were issues that needed clarification or otherwise were causing problems for his application. (Id., ¶ 43.) Alston amended his FAFSA form to provide different information regarding his household size and his and his mother's addresses. (Id., ¶ 44.) Penn State attempted to verify the information that Alston had provided. (Id., ¶ 50.) Thereafter, Penn State provided Alston with an explanation in a nine-page letter that offered Alston an opportunity to provide clarification that was being sought. (Id., ¶ 53.) Alston thereafter submitted an additional 111 pages in responses. (Id., ¶ 55.) Thus, fairly construed, Alston's amended complaint alleges that Penn State was engaged in a review of his request, and conducted an active dialogue with him about that request.

Likewise, the defendants note that Alston was obviously aware of the DOE's requirement that his mother actually reside with him in order to qualify for increased aid, because he cited to this rule in his complaint. (Id., ¶ 72 n.2.) The defendants

acknowledge that this rule requires that Alston demonstrate that his mother lives with him, and that he pays for at least 50% of her support.  Penn State maintains that it provided Alston every opportunity to make this showing, but that Alston by his own admission chose instead to fight with officials and argue that such a showing was unnecessary.  (Id.)  It is difficult to perceive how Alston can credibly argue that Penn State officials violated some procedural rule by insisting that Alston furnish them with sufficient evidence to show that he qualified for increased student aid for familial support, when Alston refused to provide that information and instead elected to debate school officials about the matter.

In any event, the allegations in the complaint do not state a claim for procedural due process, both because Alston has not credibly alleged that he had a protected entitlement to student aid or to a professional education financed through loans or other financial aid; and because Alston has not alleged facts to show how Penn State officials possibly violated any procedural right that Alston may have had with respect to the processing of his student loan requests – a process that Alston apparently declined to participate in at various points because of his frustration with the process itself.  Alston's procedural due process claim thus fails on both prongs of the due process analysis, and should be dismissed.

### D.      Equal Protection

Alston also alleges that his treatment by Penn State officials in their processing of his particular financial aid requests violated his right to equal protection under the law, in violation of the Fourteenth Amendment.  Alston claims that he is a member of a class of persons that he defines as "students with elderly parents who seek to have their eldercare expenses deemed to be educational expenses."  (Am. Compl., ¶ 107.)  Alston does not allege, credibly or otherwise, that other members of this purported "class" have been treated more favorably than he has.  In short, Alston's equal protection claim is confusing in its presentation, and unsupported in its spare allegations.

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 2.  The central purpose of the Clause "is to prevent the States from purposely discriminating between individuals on the basis of race." Shaw v. Reno, 509 U.S. 630, 642 (1993) (citing Washington v. Davis, 426 U.S. 229, 239 (1976)).  However, the Clause is also "essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).

The promise of equal protection under the law, however, "must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." Romer v. Evans, 517 U.S. 620, 631 (1996). To that end, a requirement within a law or regulation that neither burdens a fundamental right nor singles out a suspect class will be upheld "so long as it bears a rational relation to some legitimate end." Id.; see also City of Cleburne, 473 U.S. at 440 ("The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.").

Other than a passing mention of equal protection, and some citation to case law in argument that Alston makes within the amended complaint itself, Alston's complaint offers virtually nothing to support his bald claim that Penn State and the defendants treated him in a manner that violated the Equal Protection Clause. Alston seems to be claiming, on the one hand, that he and others within his purported class of students caring for elderly parents with serious health conditions were treated differently than non-class members. On the other hand, Alston seems to be claiming that he was treated differently than other members of his own class. In the end, however, Alston merely alleges based on information and belief that "Financial Aid does not subject students outside Alston's class to" the burdens that he had to face in

22

order to apply for eldercare to be taken into consideration as part of his financial aid package.  But this is hardly surprising, since only members of the class presumably would be subject to those burdens, since they would have no application to any other students in any event.

Aside from the factual dissonance in Alston's pleading, he has failed to articulate sufficient plausible facts to show that the defendants subjected him to such differential treatment in the processing of his financial aid application so as to violate his right to equal protection under the law.  We agree with the defendants that the amended complaint is so threadbare, and devoid of plausible factual allegations, that it simply does not survive after Twombly and Iqbal.  Thus, allegations such as "[u]pon information and belief, Financial Aid does not subject students outside Alston's class to these actions" are insufficient to support a claim in a federal action. Alston has not identified anybody outside of his purported class who has been treated more favorably than him, and he has not alleged facts to show that any alleged difference in treatment had no legitimate basis.  Instead, Alston has alleged frustration with Penn State officials who were tasked with processing his somewhat unusual student financial aid application; he has not plausibly claimed that these officials violated his constitutional rights as they did so, and as they discharged their

responsibilities through considerable dialogue with Alston.  As it lacks a plausible factual predicate, Alston's equal protection claim should be dismissed.

### E.      ADA and Rehabilitation Act

Alston also believes that the defendants violated his rights under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.  In support of this claim, the plaintiff advances an argument that the defendants violated his right to equal education, and failed to engage with him in an interactive dialogue regarding his own alleged medical conditions and his need for additional financial aid to subsidize his education.  Ironically, however, within the body of his complaint Alston has alleged that the defendants engaged in a detailed and lengthy dialogue with him about these matters, a dialogue that actually resulted in Alston having his borrowing authority increased.  (Am. Compl., ¶ 23.)  Following discussions that he had with defendant Bogart, Alston obtained increases in his transportation budget.  (Id., ¶ 43.) Alston was also extended emergency loan proceeds to help him after he claimed to have depleted his financial resources.  (Id., ¶ 26.)  Further, Alston enrolled as a transfer student in his second year of law school, and was able to continue his studies through his final semester of his third year.  (Id., ¶¶ 17, 1.)

At bottom, therefore, Alston does not credibly allege that the defendants interfered with his ability to pursue his professional studies.  Instead, he claims that

he wanted additional funding and resources, on a timetable that was agreeable to him. Alston complains that the defendants' processing of his loan requests, and their consideration of his requests to have his borrowing authority increased, somehow resulted in his being "required to walk long distances around Carlisle" or to "wait for several hours for public transportation on numerous days and ride for mere than four hours on public transportation on numerous days, severely jeopardizing his health and education." (Id., ¶ 132.) Alston states in conclusory fashion that the defendants "inflicted months of emotional and financial distress upon Alston." (Id.) It is difficult to understand exactly what the nature of the plaintiff's complaint here is, but we presume that the plaintiff is claiming that he was somehow discriminated against in violation of the ADA and the Rehabilitation Act by the defendants' alleged failure to engage in an interactive process to determine what assistance he required in order to complete his studies while coping with medical issues.

We do not find that these allegations support a claim under either the ADA or the Rehabilitation Act, and instead perceive that this claim to be more of a placeholder for Alston than an actual claim upon which relief could be granted. Alston does not include any plausible allegations to explain how the defendants' alleged conduct – the processing of his student financial aid paperwork and engaging in a dialogue with him about his particular requests for himself and to care for his

mother – violate either of the statutes Alston has identified.  Indeed, the unfinished

nature of this claim is clear since Alston states that "[t]his [claim] will be described

in an amendment, due to the urgent nature of the Complaint."  (Id.)

The urgent nature of the complaint is not evident, but what is clear is that the

allegations that the plaintiff has made fall far short of what is required to state a

discrimination claim under the ADA or the Rehabilitation Act, which in the

educational context provide co-extensive protection to students.  See Hornstine v.

Township of Moorestown, 263 F. Supp. 2d 887, 904 (D.N.J. 2003) (citations

omitted).  Section 504 of the Rehabilitation Act provides, in pertinent part, that "No

otherwise disabled qualified individual with a disability in the United States . . . shall,

solely by reason of his or her disability, be excluded from participation in, denied the

benefits of, or be subjected to discrimination under any program or activity receiving

Federal assistance."  20 U.S.C. § 794(a).  In the education context, this statutory

language "protects special needs students from being treated disparately on account

of their disability."  Hornstine, 263 F. Supp.2d at 904 (citing Weixel v. Board of

Educ. of City of New York, 287 F.3d 138, 149 (2d Cir. 2002)).  To establish a *prima*

*facie* case of discrimination under Section 504 or the ADA, a plaintiff must show that

(1) he is a handicapped individual; (2) he is otherwise qualified for participation in

the program; (3) the program the plaintiff is challenging receives federal funds; and

26

(4) he has subjected to discrimination under the program solely on account of his disability.  Id. (citing Nathanson v. Med. College of Pennsylvania, 926 F.2d 1368, 1380 (3d Cir. 1991)).

In this case, Alston's complaint comes up short of alleging facts that could support a claim for relief under the ADA or the Rehabilitation Act, and in fact the complaint substantially undercuts Alston's apparent theory for relief.  Assuming that Alston has credibly alleged that he has a disability that would entitle him to protection under the ADA or the Rehabilitation Act, Alston complains that the defendants failed to engage in a dialogue with him about his particular needs or requests; this seems to be the crux of his claim.  Yet Alston's complaint describes in detail an extensive and elaborate dialogue that Penn State officials engaged in with Alston before providing him an explanation as to why he was being awarded some, but not all, of the financial assistance he was requesting.  (Am. Compl, Ex.).

Thus, the documents attached to Alston's amended complaint rebut the claims made in this pleading in at least seven ways.  In these documents:  (1) Defendant Bogart communicates with Alston about making adjustments to his financial aid package based on medically necessary dietary requirements (id., pp. 11-12); (2) Executive Director Griswold communicates with Alston about making adjustments based on medical disabilities and dietary need (id., pp. 15); (3) Bogart and Griswold

email Alston about adjustments to his financial aid based on alleged medical disabilities (id., pp. 15-24); (4) Griswold and Bogart address the plaintiff's request for additional student financial aid based upon his asserted dietary restrictions and medical needs (id., pp. 26-29); (5) Alston, his professors, and the law school dean discuss his request for increased aid, and his alleged need for specific foods for his medical diet (id., pp. 31-34); (6) Alston to Bogart communicate about  adjusting his aid upward (id., pp. 36); and (7) Alston, Bogart and Griswold engage in a dialogue regarding adjustments to Alston's student financial aid based on medical needs. (id., pp. 55-59, 67-84, 145-46, and 148-50).

In short, the documents that the plaintiff attaches in support of his claim that the defendants violated the ADA and the Rehabilitation Act by failing to engage in a dialogue with him actually show that quite the opposite happened.  We thus find from the pleadings alone that the plaintiff has failed to state a claim for relief under either of these statutes, and recommend that the claim set forth in Count 7 of the amended complaint be dismissed.

## F.    Plaintiff's State Tort Claims

Lastly, the plaintiff attempts to bring three separate state tort claims against the defendants, either for negligence or for inflicting emotional distress upon him by

failing to process his student aid applications in a manner that he found acceptable. Alston also attempts to fashion a claim for defamation.

At the outset, we note that this proposed disposition of the plaintiff's federal legal claims suggests the appropriate course for the court to follow in addressing any ancillary state law claims that the plaintiff may wish to pursue against these defendants. In a case such as this, where the jurisdiction of the federal court was premised on alleged federal claims which are found to be subject to dismissal, the proper course generally is for "the court [to] decline to exercise supplemental jurisdiction over the plaintiff's state law claims. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-... the district court has dismissed all claims over which it has original jurisdiction."); United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (holding that when federal causes of action are dismissed, federal courts should not separately entertain pendent state claims)." Bronson v. White No. 05-2150, 2007 WL 3033865, *13 (M.D.Pa. Oct. 15, 2007)(Caputo, J.)(adopting report and recommendation dismissing ancillary malpractice claim against dentist); see Ham v. Greer, 269 F. App'x 149, 151 (3d Cir. 2008)("Because the District Court appropriately dismissed [the inmate's] Bivens claims, no independent basis for federal jurisdiction remains. In addition, the District

Court did not abuse its discretion in declining to address the state law negligence claims.  28 U.S.C. § 1367(c)(3); <u>see</u> <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); <u>Tully v. Mott Supermkts., Inc</u>., 540 F.2d 187, 196 (3d Cir.1976).")

In any event, we agree with the defendants that the plaintiff has failed to state a claim for negligence under Pennsylvania law.  In order to demonstrate a *prima facie* case for negligence under Pennsylvania law, a plaintiff must show that:  (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) there is a causal connection between the breach and the resulting injury; and (4) the plaintiff suffered actual loss or damage.  <u>Martin v. Evans</u>, 711 A.2d 458, 461 (Pa. 1998).  "Negligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances."  <u>Id.</u> (citing <u>Lanni v. Pa. R.R. Co.</u>, 88 A.2d 887, 888 (Pa. 1952)).

In this case, Alston claims that Penn State owed him a fiduciary duty because of the school's role as a financial aid administrator under the HEA.  (Am. Compl., ¶¶ 6, 122.)  But the very statute that the plaintiff relies upon for this assertion – the Higher Education Act – does not create a fiduciary duty between the school and Alston; it creates a fiduciary duty between Penn State and the Department of Education.  <u>Moy v. Adelphi Institute, Inc.</u>, 866 F. Supp. 696, 708 (E.D.N.Y. 1994).

30

The plaintiff's very basis for asserting a fiduciary duty was owed to him in this case is legally incorrect, and he has not adequately alleged that Penn State or the other defendants owed him a legally recognized duty with respect to the processing of student loan applications.

The plaintiff's tort claims for either intentional or negligent infliction of emotional distress fare no better.  Under Pennsylvania law, the elements of a claim for intentional infliction of emotional distress are as follows: "(1) the conduct [of the defendant] must be extreme and outrageous; (2) it must be intentional or reckless; (3) it must cause emotional distress; [and] (4) that distress must be severe." Hoy v. Angelone, 691 A.2d 476, 482 (Pa. Super. Ct. 1997).  This claim also requires an allegation of some type of physical injury, harm or illness related to the distress. Robinson v. Family Dollar, Inc., No. 14-3189, 2015 WL 3400836 (E.D. Pa. May 27, 2015) (citing Corbett v. Morgenstern, 934 F. Supp. 680, 684 (E.D. Pa. 1994)).  It is difficult to make out a cognizable claim for intentional infliction of emotional distress, in no small part because "the conduct must be 'so extreme in nature as to go beyond all possible bounds of decency such that it would be regarded as utterly intolerable to civilized society.'" Regan v. Twp. of Lower Merion, 36 F. Supp. 2d 245, 251 (E.D. Pa. 1999).  Since the plaintiff's claim is based upon no more than his frustration with Penn State officials over their processing of his particular student

loan requests, and because nothing in the amended complaint even approaches the type of "extreme" conduct that must be alleged to support a claim, we recommend that the court dismiss the plaintiff's claim for intentional infliction of emotional distress.

The plaintiff's claim for negligent infliction of emotional distress ("NIED") is similarly unavailing. In Pennsylvania, an NIED claim arises only when (1) the defendant had a contractual or fiduciary duty towards the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger and reasonably feared impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative. Under any of these four scenarios, a defendant must have unintentionally caused emotional distress to another. The plaintiff has not pleaded facts to show that any of these four situations existed, and the claim is bereft of factual allegations that could plausibly support this tort claim. It should be dismissed.

Lastly, the plaintiff has attempted to fashion a claim for defamation under Pennsylvania law. In order to plead a defamation claim, a plaintiff must allege facts to show the following elements: (1) the defamatory nature of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting

to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. 42 Pa. Cons. Stat. Ann. § 8343(a).  A statement is deemed to be defamatory "if it tends to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or injure him in his business or profession."  <u>Mzamane v. Winfrey</u>, 693 F. Supp. 2d 442, 476-77 (E.D. Pa. 2010) (quoting <u>Joseph v. Scranton Times L.P.</u>, 959 A.2d 322, 334 (Pa. Super. Ct. 2008)).  "It is not enough that the victim of the [statements] . . . be embarrassed or annoyed, he must have suffered the kind of harm which has grievously fractured his standing in the community of respectable society." <u>Tucker v. Phila. Daily News</u>, 848 A.2d 113, 124 (Pa. 2004) (quoting <u>Scott-Taylor, Inc. v. Stokes</u>, 229 A.2d 733, 734 (Pa. 1967)).  The statements alleged to be defamatory must be considered in context.  <u>Baker v. Lafayette Coll.</u>, 532 A.2d 399, 402 (Pa. 1987).

Under any reading, the amended complaint fails to state a claim for defamation. It does not identify any of the elements needed to state this claim, and the complaint cannot even be read liberally to identify any statements that could be considered defamatory.  Indeed, as with some of the plaintiff's other claims, this claim appears as little more than an afterthought, with the plaintiff representing that he intends to furnish additional detail in a future amended complaint.  This is plainly inadequate

under even liberal federal pleading rules, and there is no way to read the amended complaint to set forth a cognizable claim for defamation under Pennsylvania law.

## V.   **RECOMMENDATION**

As explained above, the plaintiff's amended complaint fails to state any viable claim for relief under the United States Constitution, Federal law, or Pennsylvania tort law arising out of the processing and handling of his student financial aid applications, and his requests for additional resources to help him support his mother and care for his own growing medical needs.   The complaint, which has been amended once already, should be dismissed without further leave to amend.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C.  § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of

that record.   The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.


                              */s/ Martin C. Carlson*              
                              Martin C. Carlson
                              United States Magistrate Judge

Dated: June 9, 2015